UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DR. PAM ADAMSON, WANDA SMITH, OPEHLIA BURROUGHS, MARY BAKER, DR. ALIEKA ANDERSON, and CHARLTON BIVENS, in their official capacities as members of the Clayton County Board of Education and individually as residents and voters in the Clayton County School District, | |
| Plaintiffs, | CIVIL ACTION |
| v. | NO. 1:12-CV-1665-CAP |
| CLAYTON COUNTY ELECTIONS AND REGISTRATION BOARD, ROBERT P. BOLIA, PATRICIA PULLAR, RUTH F. ASH, VIVIAN BALDWIN, and JIM CONSTABLE, in their official capacities as members of the Clayton County Elections and Registration Board, and the STATE OF GEORGIA, as representative of the Georgia Legislature, | |
| Defendants. | |

**O R D E R**

This action is before the court on the plaintiffs' motion for declaratory judgment and final injunctive relief [Doc. No. 24].

I.  **Factual and Procedural Background[1]**

This action, which seeks a declaration that the districts for the Clayton County Board of Education ("BOE") as currently drawn

---

[1] The facts presented in this section are drawn largely from a stipulation entered into by the parties [Doc. No. 32].

are unconstitutionally malapportioned and an injunction enforcing new district boundaries, was filed on May 11, 2012. The Clayton County Elections and Registration Board ("the Elections Board") is the entity responsible for conducting elections in Clayton County, Georgia.

Clayton County is split into nine BOE districts, each of which elects one representative to the BOE. As currently apportioned, the districts have approximately the following populations, based on the 2010 Census:[2]

| District | Population |
|----------|-----------|
| 1 | 37,680 |
| 2 | 30,199 |
| 3 | 26,657 |
| 4 | 21,551 |
| 5 | 24,532 |
| 6 | 32,025 |
| 7 | 25,538 |
| 8 | 26,914 |
| 9 | 34,328 |

---

[2] Although the stipulation filed by the parties lists slightly different populations for the districts, [Doc. No. 32 at 5], the data listed here and used for analysis in this order are those provided by the court's independent technical advisor. The parties have stipulated to the use of these data.

The apparent reason for the large deviations in the districts'
populations is that they have not been reapportioned since the 2010
Census data were released. Accordingly, the district boundaries,
which were drawn following the release of the 2000 Census, do not
incorporate the population shifts that have occurred since then. As
a result, the voting strength of a voter in Districts 1, 2, 6, and
9 would be significantly decreased relative to the voting strength
of a voter in Districts 3, 4, 5, 7, and 8 if an election was held.
Noting the likelihood that holding an election under these
conditions would violate the one-person, one-vote principles of the
Fourteenth Amendment, the court granted a preliminary injunction on
May 23, 2012, enjoining the defendants from conducting BOE
elections until further order [Doc. No. 15].

The motion now before the court requests that the court
declare the current BOE districts unconstitutional and enter final
injunctive relief by enacting a new map with constitutionally
apportioned districts for future Clayton County BOE elections.

## II. Legal Standards

### A. Declaratory judgment

The Declaratory Judgment Act, 28 U.S.C. § 2201, "provides that
a declaratory judgment may only be issued in the case of an actual
controversy." Emory v. Peeler, 756 F.2d 1547, 1551 (11th Cir.
1985). For declaratory judgment to properly be issued, "there must

be a substantial continuing controversy between parties having adverse legal interests." Id. "In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." Walden v. Centers for Disease Control and Prevention, 669 F.3d 1277, 1284 (11th Cir. 2012).

### B. Injunctive relief

> A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Monsanto Co. v. Geertson Seed Farms, --- U.S. ---, 130 S. Ct. 2743, 2756 (2010).

## III. Analysis

### A. Constitutionality of the current districts

The plaintiffs have brought this suit pursuant to 42 U.S.C. § 1983 and claim that allowing elections to proceed under the current map would violate the Equal Protection Clause of the Fourteenth Amendment. "Undoubtedly, the right of suffrage is a fundamental

4

matter in a free and democratic society. . . . Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests." <u>Reynolds v. Sims</u>, 377 U.S. 533, 561-62 (1964). Accordingly, the Supreme Court has held that the Equal Protection Clause of the Fourteenth Amendment guarantees the opportunity for equal participation by all voters in the election of state legislators, <u>id.</u> at 566, and the Court later extended the one-person, one-vote principle to apply to elections of county and local government officials, <u>Avery v. Midland County, Texas</u>, 390 U.S. 474, 476 (1968). Accordingly, "Under the Equal Protection Clause of the Fourteenth Amendment, states and local governments must provide each qualified voter with an equal opportunity to participate in any election in which persons are selected by popular vote to perform governmental functions." <u>Smith v. Cobb County Bd. of Educ. and Registrations</u>, 314 F. Supp. 2d 1274, 1284 (N.D. Ga. 2002) (citing <u>Hadley v. Junior College Dist.</u>, 397 U.S. 50, 56 (1970)("[W]hen members of an elected body are chosen from separate districts, each district must be established on a basis that will insure [sic], as far as practicable, that equal numbers of voters can vote for proportionally equal numbers of officials."). Accordingly, because Clayton County BOE members are chosen from separate districts, the State of Georgia must establish BOE districts that have

substantially equal numbers of voters to comply with the one-person, one-vote principle, and 42 U.S.C. § 1983 provides a private right of action to ensure compliance.

In this case, the parties have stipulated that the one-person, one-vote principle would be violated if elections were held under the current plan. The court agrees: under the facts as stipulated, a voter in BOE District 4, whose population is approximately 21,551, would have approximately 1.75 times the voting strength of a voter in District 1, whose population is approximately 37,680.[3] Because allowing elections to go forward under these conditions would cause injury to voters in the underrepresented districts in the future by violating their voting rights, the current map is violative of the Equal Protection Clause of the Fourteenth Amendment. The plaintiffs' motion for declaratory judgment is GRANTED.

## B. Permissible remedies

Ordinarily, the Georgia General Assembly, which is comprised of a House of Representatives and a Senate, is tasked with redrawing districts for local elections when new census data becomes available. "The Supreme Court has repeatedly emphasized

---

[3] This corresponds to an overall deviation of 55.96%. See infra at § III(D)(1) regarding the calculation of overall deviation.

6

that it is the duty and responsibility of the State to determine the apportionment of electoral districts within its borders." Smith, 314 F. Supp. 2d at 1286. In this case, it is undisputed that the BOE devised a proposed remedial map of the BOE districts on February 6, 2012, based on the 2010 Census data and that this plan was presented to the Clayton County Delegation of the General Assembly on or about February 15, 2012. Each Georgia county has a local delegation comprised of every legislator whose district encompasses territory within that county. Smith, 314 F. Supp. 2d at 1281 and n.6 (N.D. Ga. 2002). Generally, when local legislation -- that which applies only to a specific city, county, or special district -- receives the requisite number of signatures of local delegation members, the House and Senate pass the legislation as a matter of local courtesy. Id.

> The underlying assumption of local courtesy is that the bill affects only a certain city or county, and, therefore, representatives and senators of other districts should defer to that local delegation's judgment. Local courtesy is a custom, however, and is not provided for in either the House or Senate rules. Should a member of the House or Senate choose to challenge local legislation on the floor, local courtesy is not enforced.

DeJulio v. Georgia, 290 F.3d 1291, 1294 (11th Cir. 2002).

For reasons unknown to the court, no map, including that proposed by BOE members, was passed into law by the Georgia General Assembly during its 2012 regular session, and no special session is

scheduled to address this failure. Accordingly, in the face of inaction by the elected representatives tasked with implementing new maps, "it becomes the unwelcome obligation of the federal court to devise and impose a reapportionment plan pending later legislative action." Larios v. Cox, 314 F. Supp. 2d 1357, 1359-60 (N.D. Ga. 2004) (three judge panel) (aff'd sub nom. Cox v. Larios, 542 U.S. 947 (2004)).

Moreover, in this case, implementing the BOE's proposed remedial map was not a practical option. This is because of time constraints imposed by the Voting Rights Act ("VRA"), 42 U.S.C. § 1973 et seq. Under Section 5 of the VRA, certain states, including Georgia, are prohibited from enforcing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" unless they have either (1) obtained a declaratory judgment from the District Court for the District of Columbia that this change is not for the purpose or with the effect of denying or abridging the right to vote on account of race or color or (2) submitted the proposed change to the Attorney General for preclearance. 42 U.S.C. §§ 1973b-1973c. The Attorney General has up to 60 days after submission of the proposed change to object, 42 U.S.C. § 1973c(a), but states typically choose to seek preclearance from the Attorney General because the preclearance

process tends to be less time-consuming than the altrenative. Smith 314 F. Supp. 2d at 1293 n.14.

While there is an exception to Section 5's preclearance requirement for courts creating remedial apportionment plans, Connor v. Johnson, 402 U.S. 690, 691 (1971), the exception does not apply if a district court acts as a mere rubber stamp for a plan it has not created. Smith, 314 F. Supp. 2d at 1294 (citing McDaniel v. Sanchez, 452 U.S. 130 (1981)). Accordingly, unless a court actually fashions a plan itself instead of relying on a plan presented by a litigant, the plan must proceed through normal preclearance procedures before being implemented. Id.

In this case, the BOE's proposed remedial plan was not presented to the court until early June [Doc. No. 8]. Even if the court had summarily approved it and the parties had submitted it to the Attorney General for preclearance, the Attorney General would have had until early August to object to the plan, well after several deadlines imposed by state and local laws regarding proper timing for BOE elections. Moreover, courts have expressed concerns about the opportunity for various stakeholders in the reapportionment process to manipulate the system or skirt Section 5's preclearance requirement by having a district court other than the D.C. District Court implement a plan not passed by the appropriate legislative body. See Smith, 314 F. Supp. 2d at 1294

(citing concerns from <u>McDaniel</u> that allowing local district courts to implement plans crafted by others might encourage a covered jurisdiction wishing to avoid preclearance to refuse to redistrict and take the plan to the local district court instead or, alternatively, that a General Assembly member could purposefully block a redistricting bill that would likely pass a floor vote in hopes that the member's alternative plan would be approved by the court). Accordingly, the court declines to implement the plaintiffs' proposed remedial plan. Instead, the court has crafted its own plan which, because it was crafted by the court, will not be subject to Section 5's preclearance requirement.

## C. Procedure for crafting the new map

On May 23, 2012, the court directed the parties to present a proposed scheduling order for this case that would apprise the court of the dates and balloting deadlines for election dates already scheduled in Clayton County [Doc. No. 16]. From the parties' joint filing, it was clear that the only way to enact a new BOE map, hold qualifying, make a ballot, hold a BOE election, and seat a board in January 2013 without scheduling a separate special election (at a great cost to the taxpayers of Clayton County) was to hold the BOE election in conjunction with the General Election on November 6, 2012. The court then set a schedule for this case with the goal of ensuring that all relevant local,

state, and federal deadlines could be met for the November 6 election [Doc. No. 22].[4]

When it became apparent that, because of the time constraints involved in this case, including those that would be imposed if the court did not craft its own map independent of the parties, the court determined that it needed an independent technical advisor to aid in the map-drawing process. Following notice to the parties of the court's intention to engage such an advisor due to the court's lack of the necessary skills and resources for crafting a remedial plan, the court, pursuant to its inherent power to do so, <u>see Reilly v. United States</u>, 863 F.2d 149, 154-61 (1st Cir. 1988) (citing <u>Ex parte Peterson</u>, 253 U.S. 300 (1920)), appointed the Legislative and Congressional Reapportionment Office of the General Assembly of the State of Georgia and its necessary staff, including Regina Harbin Wright, as its independent technical advisor in this matter [Doc. No. 23]. The court then met with Ms. Wright in order to fashion a new map.

---

[4] It has come to the court's attention that another case pending in this district may have some bearing on the propriety of the State of Georgia's handling of overseas absentee ballots. <u>See United States v. Georgia</u>, Civil Action No. 1:12-CV-2230 (N.D. Ga.). Nothing in this order affects the proceedings in that case; accordingly, the parties should take care to conform with any applicable guidelines resulting therefrom.

In deciding how to craft such a new map, the court first considered a so-called "minimum change" plan. "This 'minimum change' doctrine acknowledges that redistricting is fundamentally a legislative task, best handled by those elected representatives in whose hands the voters have placed their trust to handle such matters, rather than an unelected federal judge." Bodker v. Taylor, Civil Action No. 02-CV-999-ODE, 2002 WL 32587312 at *5 (N.D. Ga. June 5, 2002). Nevertheless, because the plan duly enacted by the State of Georgia, the "2002 Plan," was fraught with unconstitutionality, the court determined it was unnecessary under the law to defer to that map and make only minimal changes. See Smith, 314 F. Supp. 2d at 1292-93 (distinguishing Upham v. Seamon, 456 U.S. 37 (1982), and determining that no deference was due to an outdated and unconstitutional plan). The court therefore drew its map unconstrained by traditional "minimum change" concepts. Additionally, when crafting its own proposal, the court had in its possession the plaintiffs' proposed remedial map. See [Doc. No. 25-3]. Though the court confirmed that its proposed plan was not wildly different on a superficial level from the plaintiffs' proposed plan after the court's plan was nearing completion, the plaintiffs' proposed remedial map was ultimately of little assistance in preparing a proposed map.

In crafting its own plan, the court's primary goal was to remedy the complained-of constitutional violations in the current map by minimizing the population deviations among the districts. Because, as shown *infra*, the court determined its remedial map should conform to the Voting Rights Act Sections 2 and 5, the court's starting point for its plan was the so-called "benchmark," which is established by using the district boundaries from the 2002 Plan and applying population data from the 2010 Census to determine the current population breakdowns. The court then made adjustments of the boundaries to minimize population deviations among the districts while conforming with the traditional districting principles of compactness, contiguity, preservation of the cores of existing districts, and preservation of significant political and geographic subdivisions; the court also took incumbent considerations into account. The court also took care to ensure its proposed map conformed with the Voting Rights Act before publicizing it and opening it up to comments and criticism.

On June 15, 2012, the court made public its proposed remedial plan, including several versions of the map and population statistics associated therewith [Doc. No. 29]. The court caused the proposed map to be displayed in the clerk's office and on the clerk's website and directed the parties to cause it to be displayed in the offices of the Clayton County BOE and the Clayton

County Elections Board [id.]. The court also directed the plaintiffs to run notice on June 20, 22, and 23 in the legal organ of Clayton County [Doc. No. 22]. The notice was to indicate that interested parties could obtain copies of the proposed map in the aforementioned places, that any party wishing to intervene was to file its motion to intervene along with objections to the plan by June 25, 2012, and that a hearing on the proposed map would be held on June 28, 2012 [id.]. The parties stipulate that the notice was run in accordance with the court's order [Doc. No. 32 at 8].

No parties moved to intervene, and the only attendees at the hearing on June 28, 2012, were the parties and one distinguished member of the press; none of these attendees had objections to the court's proposed remedial map. Accordingly, the court adopted the proposed remedial map (the "Court's Plan") as its final map in open court.[5]

---

[5] Attached to this order are three versions of the map generated by the Court's Plan: Exhibit 1 shows the district boundaries with no details other than municipalities and precinct lines; Exhibit 2 shows the district boundaries with details such as road names and has red indicators for the current addresses of the incumbent Board of Education members; Exhibit 3 shows the district boundaries and has the details from Exhibit 2 along with the boundaries of the districts from the 2002 Plan. Also attached to this order as Exhibit 4 is a statistical breakdown of the Court's Plan.

**D.  Analysis of the court's plan**

**1.  Population deviations**

In devising and evaluating a remedial plan for compliance with
the equal protection clause, "the usual measure is the percent
deviation from the ideal population." <u>Bodker v. Taylor</u>, Civil
Action No. 1:02-CV-999-ODE, 2002 WL 32587312 at *6 (N.D. Ga. June
5, 2002). The ideal district population is calculated by dividing
the overall population of the county by the number of districts,
and the deviation from the ideal is calculated by reference to the
overall population rather than taking a district-by-district view.
<u>Id.</u> The overall population deviation, which is the difference in
population between the two districts with the greatest population
disparities, is the ultimate reference point for constitutionality.
<u>Id.</u>

Although there is no absolute cut-off for the "maximum overall
deviation that an apportionment plan may have before it violates
the Fourteenth Amendment, the [Supreme] Court has held that any
deviation in state legislative apportionment plans smaller than 10%
overall is considered de minimis and is thus consistent with the
requirements of the constitution." <u>Smith v. Cobb County Board of
Elections and Registrations</u>, 314 F. Supp. 2d 1274, 1285 (N.D. Ga.
2002). Local redistricting plans must also comport with the de
minimis standard, and "[c]ourt-ordered districts are held to higher

15

standards of population equality than legislative ones." <u>Abrams v.</u>
<u>Johnson</u>, 521 U.S. 74, 96 (1997). Absolute population equality is
the paramount objective. <u>Id.</u> (quotation omitted).

Nevertheless, small differences in district populations may be
justified by traditional districting principles, so long as they
are consistent with constitutional norms. <u>Karcher v. Daggett</u>, 462
U.S. 725, 740 (1983). Accordingly, courts crafting remedial maps
often incorporate these principles, such as compactness,
contiguity, preservation of the core of the existing districts, and
preservation of significant political and geographic subdivisions.
<u>See</u>, <u>e.g.</u>, <u>Crumley v. Cobb County Bd. of Elections and Voter</u>
<u>Registration</u>, Civil Action No. 1:12-CV-1301-SCJ, Final Order [Doc.
No. 45] at 23 (N.D. Ga. May 9, 2012) (citing <u>Abrams</u>, 521 U.S. at
95). Additionally, some courts consider communities of interest
important to drawing a logical and cohesive map. <u>Crumley</u> at 28.

The court's remedial plan carries the following population and
deviation statistics:

| District | Population | Deviation[6] |
|---|---|---|
| 1 | 28,776 | -0.20% |
| 2 | 28,891 | 0.23% |
| 3 | 28,822 | -0.01% |
| 4 | 28,873 | 0.17% |
| 5 | 28,687 | -0.48% |
| 6 | 28,737 | -0.30% |
| 7 | 28,882 | -0.01% |
| 8 | 28,931 | 0.37% |
| 9 | 28,895 | 0.25% |

Especially in light of the court's concerns with the traditional districting principles listed below as well as the Voting Rights Act constraints, the Court's Plan -- with a de minimis total deviation of 0.85% -- is well within the permissible deviation range for one-person, one-vote purposes.

## 2. Traditional districting principles

### i. Compactness

Compactness is generally understood as an aesthetic evaluation of district shapes as a means to avoid strangely-shaped or bizarre-looking districts. See Nathaniel Persily, When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans, 73 Geo.

---

[6] The deviations presented here are based on an ideal district population of 28,824, which was reached by taking the total population (259,424) and dividing by the number of districts (9), then rounding down.

Wash. L. Rev. 1131, 1158 (2005). The districts in the Court's Plan are reasonably compact.

### ii.  Contiguity

A contiguous district is one whose borders allow a person to walk to all parts of the district without having to go through another district. Id. at 1159. The districts in the Court's Plan are all contiguous.

### iii. Preservation of the core of the existing districts and communities of interests

"People who share communities of interest logically belong within the same district." Crumley at 28 (quoting Johnson v. Miller, 922 F. Supp. 1556, 1562-63 (S.D. Ga. 1995)). At least one court crafting new districts for a board of education has recognized "the strong communities of interest that exist around the attendance zones for the high schools in the County, as well as the elementary and middle 'feeder schools' that send students to those high schools." Smith, 314 F. Supp. 2d at 1306.

In this case, preserving the cores of the existing districts and communities of interest were less influential principles than the other traditional districting principles. The court was presented no evidence on either the communities of interest or what might constitute the core features of the existing districts. Without such evidence, the court was left to speculate whether

certain areas should be grouped together in a certain district based on these factors. Additionally, the court's guesses as to which areas may constitute the core of a certain existing district often conflicted with the other districting principles -- especially compactness -- because of the odd shapes of the 2002 Plan's districts. Accordingly, the court gave more weight to those principles that were more easily definable.

### iv. Preservation of significant political and geographic subdivisions

Often at odds with the compactness principle, this principle's main goals are to avoid unnecessarily splitting municipalities while respecting natural or other logical breaks in the geography of the county. Persily, <u>supra</u>, at 1159. The Court's Plan is reasonably in accord with this principle, especially in light of the other principles listed here and the time-sensitive nature of the map-drawing process. Additionally, the court notes that it made all reasonable efforts not to split voting precincts between two or more districts. Where it was necessary to split a precinct, the court's independent technical advisor was especially adept at using identifiable boundaries such as major highways or main streets as the lines of demarcation.

### v. Incumbent considerations

Protection of incumbents, while not the highest priority for the court, is a legitimate consideration in light of the State of Georgia's tradition of not placing incumbents in the same district through the redistricting process. See Smith, 314 F. Supp. 2d at 1307. Moreover, it is undisputed in this case that the BOE members are elected for four-year terms on a staggered basis such that BOE elections must be held every two years. That is, less than all of the BOE seats are up for election in 2012, and some seats will not come up for re-election until 2014. The court is under the impression that its remedial plan avoids the issue of placing an incumbent from the latter category (i.e., one who was elected to serve until 2014) into a district whose seat is up for election in 2012 by simply keeping all the incumbents in the districts that elected them or to which they were appointed.

### 3. Voting Rights Act

"The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." Georgia v. Ashcroft, 539 U.S. 461, 490 (2003). Although the Act's language does not explicitly apply to redistricting plans fashioned by courts, courts are expected to comply with the mandates of Sections 2 and 5 of the Act. See Smith, 314 F. Supp. 2d

at 1295, 1299; Crumley at 34; Abrams v. Johnson, 521 U.S. 74, 91
("On its face, § 2 does not apply to a court-ordered remedial
redistricting plan, but we will assume courts should comply with
the section when exercising their equitable powers to
redistrict."); id. at 96 ("[I]n fashioning the plan, the court
should follow the appropriate Section 5 Standards, including the
body of administrative and judicial precedents developed in Section
5 cases."). The parties also agree that the court's plan should
comply with Sections 2 and 5 of the VRA.

Section 2 "prohibits States from imposing or applying any
voting practice or procedure that dilutes, denies, or abridges the
right of any citizen of the United States to vote, on account of
that citizen's race or color." Smith, 314 F. Supp. 2d at 1299
(citing 42 U.S.C. § 1973 and Thornburg v. Gingles, 478 U.S. 30, 36
(1986)). Proper analysis under Section 2 requires a court to
consider whether, under the totality of circumstances, minorities
have been granted an equal opportunity to participate in the
political process and to elect representatives of their choice. Id.
(citing 42 U.S.C. § 1973(b) and Abrams, 521 U.S. at 91).

Section 5, on the other hand, has the limited substantive goal
of ensuring "that no voting-procedure changes would be made that
would lead to a retrogression in the position of racial minorities
with respect to their effective exercise of the electoral

franchise." <u>Georgia v. Ashcroft</u>, 539 U.S. at 477. "Unlike the inquiry under § 2, a retrogression inquiry under § 5, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." <u>Id.</u> at 479. First, the retrogression inquiry must encompass the entire plan; thus, "while the diminution of a minority group's effective exercise of the electoral franchise in one or two districts may be sufficient to show a violation of § 5, it is only sufficient if the covered jurisdiction cannot show that gains in the plan as a whole offset the loss in a particular district." <u>Id.</u> Second, an effective assessment of the retrogression of a minority group's effective exercise of the electoral franchise "depends on an examination of all the relevant circumstances, such as the ability of minority voters to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan." <u>Id.</u>

The Section 5 analysis compares the court's plan to the "benchmark" plan, which is formed by applying the 2010 census data to the district boundaries currently in effect. <u>See</u> <u>Smith</u>, 314 F. Supp. 2d at 1298. The court's plan statistically compares to the benchmark as follows:[7]

---

[7] BVAP is a representation of the black voting age population, expressed in this table as a percentage of the total voting age

| District | Benchmark Plan | | | Court's Plan | | | Change | |
|---|---|---|---|---|---|---|---|---|
| | Population | % Total black | % BVAP | Population | % Total black | % BVAP | % Total black | % BVAP |
| 1 | 37,680 | 67.55% | 64.46% | 28,766 | 70.24% | 67.14% | 2.69% | 2.68% |
| 2 | 30,199 | 80.74% | 79.98% | 28,891 | 78.46% | 77.77% | -2.28% | -2.21% |
| 3 | 26,657 | 86.20% | 85.01% | 28,822 | 79.13% | 77.73% | -7.07% | -7.28% |
| 4 | 21,551 | 68.63% | 67.29% | 28,873 | 75.39% | 74.30% | 6.76% | 7.01% |
| 5 | 24,532 | 67.83% | 65.40% | 28,687 | 66.04% | 62.91% | -1.79% | -2.49% |
| 6 | 32,025 | 66.13% | 62.28% | 28,737 | 65.23% | 61.72% | -0.90% | -0.56% |
| 7 | 25,538 | 45.68% | 44.45% | 28,822 | 47.18% | 45.83% | 1.50% | 1.38% |
| 8 | 26,914 | 57.54% | 55.95% | 28,931 | 66.71% | 65.22% | 9.17% | 9.27% |
| 9 | 34,328 | 68.17% | 65.99% | 28,895 | 62.10% | 59.72% | -6.07% | -6.27% |

Taking into account all circumstances relevant in this case, the Court's Plan does not result in retrogression under Section 5. Of note, the court's plan preserves the majority-minority status of all eight majority-minority districts under the benchmark. While the drop in total black population and BVAP in some districts may seem rather large at first glance, these are more than explained by the distribution of gains in other districts. For instance, while Districts 3 and 9 lose approximately 6-7% in terms of both total black population as a percentage of total population and BVAP percentage under the Court's Plan, Districts 4 and 8 gain approximate 7% and 9% in both categories, respectively. See Georgia v. Ashcroft, 539 U.S. at 479 (discussing offsets). Moreover, there is no reason to conclude that even the largest drops results in the diminution of African-Americans' effective exercise of the electoral franchise in light of the large majorities they enjoy in

population.

the eight majority-minority districts. That is, in each of the majority-minority districts, the total black population percentages (ranging from 62.10% to 79.13%) and the BVAP percentages (ranging from 59.72% to 77.77%) each constitute strong enough majorities that they would likely be able to elect a candidate of their choice. The sole majority-nonblack district, District 7, sees its total black population percentage and BVAP percentage increase slightly between the benchmark and the Court's Plan. This result is consistent with non-retrogression principles applicable to influence districts. See Georgia v. Ashcroft, 539 U.S. at 463 (describing "influence districts" as those "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process").

Similarly, under Section 2, after considering the totality of the circumstances, the court finds that its plan does not result in dilution of any minority's voting strength and that minorities have been granted an equal opportunity to participate in the political process and to elect representatives of their choice.

**E.    Suitability of an injunction**

Based on the foregoing analysis, the court finds an injunction necessary in this case. Without an injunction, the plaintiffs will suffer irreparable injury by having their voting rights infringed and by having the actions of any BOE elected from unconstitutional

24

districts subject to legal challenges. In particular, a member of the BOE elected under the 2002 Plan could be subject to a challenge of his or her right to hold office based on the unconstitutionality of the 2002 Plan. Such a challenge, if successful, could have significant negative effects upon the BOE and severely impair its ability to conduct the business of the Clayton County School District. Not only would this injure the BOE member, it would also cause harm to the public of Clayton County in that the entire BOE could not legally function and the taxpayers would necessarily incur legal fees to defend such a challenge. The remedies available at law are inadequate to compensate for these injuries. The court does not need to balance the equities between the plaintiffs and the defendant; they have stipulated that an injunction is appropriate. Finally, the public interest would not be disserved by an injunction in this case. To the contrary, and as stated above, the public interest would be harmed by allowing the BOE elections to proceed under the 2002 Plan.

## IV. Conclusion

The plaintiffs' motion for declaratory judgment and final injunctive relief [Doc. No. 24] is GRANTED. The current map for the Clayton County BOE is DECLARED to be of no effect. The Court's Plan is hereby confirmed as the lawful plan for Clayton County BOE

elections until such time as the State of Georgia implements a new plan, and the defendants are hereby ENJOINED as follows:

(1) The Court's Plan is hereby adopted, and the defendants are hereby directed to implement this plan promptly and consistently with the Constitution and laws of the United States and the Constitution and laws of the State of Georgia.

(2) The Court's Plan shall apply to the 2012 BOE election. This election shall be held as a special election placed on the ballot of the November 6, 2012, General Election.

(3) Because of exigent timing circumstances, no primary elections will be held for the BOE Special Election. Instead, each candidate duly qualified under the applicable principles of state and local law and this order shall be placed on the BOE Special Election ballot.

(4) Qualifying for the BOE Special Election shall take place from 9:00 a.m. on July 30, 2012, through 12:00 p.m. on August 1, 2012.

(5) All other matters of scheduling, balloting, and voting (including early and absentee voting and any runoff elections necessary) shall be conducted in accordance with any applicable federal, state, and local laws except that any state or local laws in direct conflict with this order are

hereby SUSPENDED for the purposes of the 2012 BOE Special Election only.

(6) The court shall retain jurisdiction over this action for the proper implementation of the Court's Plan and for such other and further orders as may be necessary.

SO ORDERED, this 13th day of July, 2012.

/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL JR.
United States District Judge